**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-02213-CNS-TPO

THE ESTATE OF VICTOR ESQUIVEL,
 by and through personal representative Marisol Montalvan,

      Plaintiff,

v.

DEAN WILLIAMS,
ED CALEY,
DAVID LICANO,
VIRGIL FONTENOT,
APRIL ORTIZ,
MARY ANN GARCIA,
NATHAN BENNION,
CHRISTOPHER BUCHANAN,
AMOY HINES,
ANDREW VRELL,
BRADY ROBINSON
individually,

      Defendants.

---

**SCHEDULING ORDER**

---

**1. DATE OF CONFERENCE
AND APPEARANCES OF COUNSEL AND PRO SE PARTIES**

A Scheduling Conference pursuant to Fed. R. Civ. P. 16(b) occurred on December 17,

2024. Counsel for the parties who participated in the Scheduling Conference are:

David G. Maxted                              **Amy E. Adams**
**Stephanie M. Frisinger**                   **Joshua G. Urquhart**
MAXTED LAW, LLC                              OFFICE OF THE ATTORNEY GENERAL
1543 Champa Street, Suite 400                Civil Litigation & Employment Law Division
Denver, CO 80202                             1300 Broadway St. Floor 10
dave@maxtedlaw.com                           Denver, CO 80203
stephanie@maxtedlaw.com                      Amy.adams@coag.gov
                                             Joshua.urquhart@coag.gov
*Counsel for Plaintiff*
                                             *Counsel for Defendants*

## 2. STATEMENT OF JURISDICTION

Plaintiff contends this action arises under the Constitution and laws of the United States,

including Article III, Section 1 of the United States Constitution, and 42 U.S.C. § 1983 and § 1988.

Plaintiff contends jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331,

1343, 2201, and 2202.

Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42

U.S.C. § 1988, and other relevant law.

Plaintiff contends venue is proper in the District of Colorado pursuant to 28 U.S.C. §

1391(b), as the district where all relevant events and omissions occurred.

Defendants do not object to jurisdiction or venue as to the claims asserted.

## 3. STATEMENT OF CLAIMS AND DEFENSES

**Plaintiff**: Plaintiff in this case is Victor Esquivel's mother, Marisol Montalvan. Mr.

Esquivel has two surviving children who were ages 11 and 12 at the time of his death. Ms.

Montalvan was a loving, dedicated mother who advocated for her son until he tragically died

while incarcerated in the Colorado Department of Corrections (CDOC). Mr. Esquivel long

struggled with mental illness including substance use disorder. Mr. Esquivel had a history of

self-medicating that was known and understood by Defendants. In the period preceding his

death, it became apparent that Mr. Esquivel had a seizure disorder. Medical personnel believed

narcotics use aggravated and precipitated these seizures. However, Mr. Esquivel never received

assessment or treatment for his alarming neurological condition. Mr. Esquivel was further left

unprotected and unaccounted for by Department of Corrections personnel and was eventually

found dead in his cell with lidocaine toxicity that precipitated a seizure.

**Victor Esquivel Was A Young Father In Need of Help**

In 2013 at the age of 20, Mr. Esquivel began his prison sentence in CDOC. While

incarcerated in CDOC, Mr. Esquivel had a history of documented mental health conditions and

suffering. He was diagnosed with depression, anxiety, substance use disorder, and PTSD. At

points, his suffering led to attempted suicide and self-harm while in CDOC. Mr. Esquivel also

suffered trauma while in CDOC, including being the victim of assault that left him seriously

injured.

Due to receiving inadequate medical and mental health care in CDOC, Mr. Esquivel

turned to self-medicating at times to attempt to ease his suffering and symptoms, including using

unprescribed medications and substances.

In addition to self-medicating with substances to alleviate his untreated mental health

symptoms, Mr. Esquivel also suffered from an underlying seizure disorder. In the leadup to his

death in 2022, this combination of conditions would result in a series of life-threatening seizure

emergencies following the tragic death of a family member.

**Defendants Knew Mr. Esquivel's Mental Health Was Deteriorating in the Wake of
His Sister's Death**

In December 2021, Mr. Esquivel's sister, Luisa, tragically died. Even over his years of

separation from Luisa due to his incarceration, they remained in contact and Luisa continued to support Mr. Esquivel during his time in prison. Due to his incarceration, Mr. Esquivel was unable to say goodbye to Luisa, to attend her funeral, or to grieve with loved ones.

Mr. Esquivel repeatedly alerted Defendant medical personnel as well as Defendant corrections officers that he was struggling to cope with Luisa's passing which exacerbated his underlying mental illness in the time preceding his death.

**Multiple Life-Threatening Seizures in 2022**

In the leadup to his death, Mr. Esquivel suffered a number of alarming medical and neurological events, including multiple serious seizures, which put Defendants on notice of the risk of death and harm he faced. Simultaneously, he repeatedly tested positive for substances including lidocaine, and lidocaine patches were found in his cell, indicating he was self-medicating to alleviate mental health symptoms with this dangerous substance which lowers the seizure threshold

On April 21, 2022, Mr. Esquivel declared a medical emergency while working in food service. He reported feeling really dizzy and was concerned about his blood pressure. On information and belief, this was a seizure event.

On May 15, 2022, Mr. Esquivel was found on the floor of the day hall, seizing, unresponsive, and foaming at the mouth. Mr. Esquivel had a golf ball sized lump on his head, a pool of blood so large his right eye could not open, a dilated pupil in his open eye, blood around the side of his mouth, and had urinated on himself. Staff reported a vacant stare from Mr. Esquivel while he seized. During Mr. Esquivel's seizure, five corrections officers pinned him down physically, and the seizure took about 10 minutes to end. Staff then placed him on a

backboard and gurney and transported him to medical. When Mr. Esquivel could speak, his speech was slurred.

Defendant Bennion completed a medical consult of Mr. Esquivel and approved Mr. Esquivel for emergency transport due to this life-threatening seizure. Staff immediately suspected that use of some substance had helped trigger Mr. Esquivel's May 15 seizure. The emergency room physician who treated Mr. Esquivel alerted his CDOC care team that should Mr. Esquivel have multiple seizure events, he needed to be evaluated for a seizure disorder. This information was then provided to Defendants Bennion, Buchanan, and other medical staff in Mr. Esquivel's medical record.

Defendant Bennion also interviewed Mr. Esquivel on May 15 when he returned from the hospital and learned information about the seizure event. Defendant Bennion, in consultation with Defendant Buchanan, knew Mr. Esquivel's seizure may be related to his self-medicating with substances lowering the seizure threshold or otherwise contributing to causing the seizures.

On May 15, Mr. Esquival also informed staff including Defendant Bennion that he'd had seizures for years dating back to 2016 if not earlier, including a seizure in 2018, and his medical file noted prior seizures. Mr. Esquivel also noted he'd fallen and hit his head, suffering a trauma, about two weeks earlier in what was also believed to be a seizure. This informed staff Mr. Esquivel was likely suffering from an underlying seizure disorder and that he required an immediate evaluation, as hospital emergency room staff also informed Defendants upon his discharge.

On June 5, 2022, Mr. Esquivel suffered yet another life-threatening seizure event. On that date, he suffered a seizure and was hospitalized after behaving erratically, having difficulty

5

speaking or constructing a sentence, being confused, incoherent, and being unable to comply with even simple commands. As with his prior seizure events, staff suspected substances were involved, noting "dangerous drugs" suspected. Corrections staff searched Mr. Esquivel's cell and found that he had a substantial amount of property missing, including clothing, soap, shoes, and other items. Defendants knew incarcerated persons at times trade or sell property in exchange for prescription drugs or other substances. Therefore, they noted Mr. Esquivel's missing property as evidence he was trading or selling it for the dangerous substances he'd been ingesting.

When brought to the infirmary on June 5, Mr. Esquivel told medical staff that he believed he was going to have a seizure. Medical staff notified Defendant Bennion of the incident and hospitalized Mr. Esquivel. Upon Mr. Esquivel's return from the hospital the following day, June 6, he told medical staff that he was concerned about his seizures, again reiterated he'd fallen and hit his head weeks prior during a likely seizure, and that he'd had other events he believed may be seizures. Mr. Esquivel also stated he had not received mental health treatment in months and was not taking psychiatric medications. Defendants Bennion and Buchanan learned of this information through consultation or presence, and consulting Mr. Esquivel's medical records. Defendants once again failed to seek or refer Mr. Esquivel for a neurological or seizure evaluation, and failed to take any other action that would alleviate his symptoms, prevent life-threatening seizures, or cut off access to the dangerous drugs he was using to self-medicate.

### August 9:  Mr. Esquivel Suffers Another Life-Threatening Seizure Related to Lidocaine

On August 9, 2022, Mr. Esquivel suffered yet another life-threatening seizure related to his use of lidocaine. On that date, staff found Mr. Esquivel in an alarming state, slipping in and out of consciousness on his lower bunk, manifesting concerning symptoms. Mr. Esquivel was

observed as incoherent, and about every thirty seconds he would kick his arms and swing his legs. When staff spoke to Mr. Esquivel, his eyes would roll back in his head and he would seemingly slip in and out of consciousness. Mr. Esquivel eventually went entirely unconscious and his body went limp. Correctional staff brought him on a backboard and gurney to the prison infirmary, where Defendant Bennion assessed him.

Defendant Bennion, in consultation with Defendant Buchanan, learned the above information and also assessed Mr. Esquivel in medical, who they saw obviously suffered a serious "grand mal" seizure. During the incident, his muscles were observed contracting and jerking. Between episodes, Mr. Esquivel was able to state his name and at one point stated, "going to happen," alerting Defendants of the seizure coming on again. In the infirmary after the serious seizure concluded, Defendant Bennion observed Mr. Esquivel was nonsensical and unable to recall what occurred.

Defendants Bennion and Buchanan knew that Mr. Esquivel was so ill he was unable to perform tasks in a neurological exam, including tasks regarding cranial nerves, grip strength, and other neurological testing. Mr. Esquivel stated he was unable to perform such tasks, raising a major red flag that neurological problems were at issue in causing the life-threatening seizures.

Defendant Bennion and Defendant Buchanan consulted regarding the matter and shared the information known and as alleged in the Complaint. They also knew substances, including likely lidocaine, were likely part of the cause of this seizure, as occurred with prior seizures. They knew he'd been likely consuming lidocaine by boiling the patches and drinking the liquid. They knew lidocaine lowers the seizure threshold and thus can trigger seizures. They knew Mr. Esquivel needed an immediate seizure and neurological evaluation, particularly given he was

physically unable to complete basic neurological testing, and given the prior dangerous seizures.

Defendant Bennion, as well as all Defendants, knew that some people in the facility were drinking lidocaine after boiling down patches. Defendant Bennion knew that Mr. Esquivel's seizures were related to lidocaine and an underlying seizure disorder. Aware of the likely role of lidocaine in causing the seizures, Defendant Bennion in consultation with Defendant Buchanan ordered lab tests including to test Mr. Esquivel for lidocaine level. The test was collected on August 9, 2022, and the report completed and available for review in his medical record on August 12, 2022. The lab result showed Mr. Esquivel positive for lidocaine, confirming he had consumed the substance and its role in causing the life-threatening seizures.

Despite ordering the test, Defendants Bennion and Buchanan failed to take action even after the positive test for lidocaine in Mr. Esquivel's lab results. They failed to even review the lab results until over a month later on September 13, 2022, after Mr. Esquivel's death. These Defendants knew the test result was urgently necessary to ascertain the suspected cause of Mr. Esquivel's seizures, yet failed to even check the result, in deliberate indifference to the obvious dangers.

Defendants Buchanan and Bennion failed to prescribe Mr. Esquivel medication to treat his apparent seizure disorder. They knew that Mr. Esquivel's seizures were considered "grand mal" or tonic-clonic, involving convulsion, loss of consciousness, and could be fatal. Critically, in handling Mr. Esquivel's August 9 seizure event, Defendants Bennion and Buchanan intentionally did not call for an ambulance or even non-emergently send Mr. Esquivel for a seizure or neurological evaluation, in deliberate indifference to the dangers. Defendants Bennion and Buchanan knew as of May 15 Mr. Esquivel likely needed a seizure and neurological

8

evaluation from a specialist; by August 9, the need for that evaluation and care was obvious and urgent. They knew Mr. Esquivel had been hospitalized twice in the last several months for dangerous seizures, knew these episodes were continuing, and yet knowingly and deliberately made a decision not to hospitalize or refer him for evaluation on or after August 9.

There are over 30 different kinds of seizures and as many different types of anti-seizure medications. Proper diagnosis and treatment is highly technical and requires a neurologist as well as specialized testing such as electroencephalograms (EEGs), spinal taps, blood tests, neurological exams, magnetic resonance imaging tests (MRIs), etc.

Defendants failed to take action to ensure Mr. Esquivel was assessed and treated, which they knew by August 9 was an emergency need. Such treatment would have involved prescription medication that would prevent future seizures and save Mr. Esquivel's life. Similarly, Defendants (or a specialist, had they referred him as needed) could have and should have prescribed "rescue medications" in the event of a seizure and ensured such medications were on hand for Mr. Esquivel which would disrupt the seizure and related symptoms. Such rescue medications are successful at preventing death and other harm from seizures and could have been made available in case of emergency for Mr. Esquivel. By failing to do so, Defendants failed to meet the standard of care and acted in deliberate indifference to Mr. Esquivel's life and health.

### August 9 Cell Search Confirms Access to Dangerous Lidocaine Patches

Defendants knew lidocaine played a role in Mr. Esquivel's seizures. On August 9, Defendant Vrell searched Mr. Esquivel's cell following his seizure, searching for evidence of the substance involved in causing the seizure. They found unknown white pills, a flex pen with

residue inside, and four lidocaine patches, which Mr. Esquivel was not prescribed to possess or use. Defendant Vrell once again found a discrepancy in Mr. Esquivel's property which was a clear indication Mr. Esquivel was buying lidocaine patches, and likely other substances, using prison property and other personal possessions.

Defendant Vrell reported finding the unprescribed lidocaine patches to his superiors and medical staff, including Defendants Fontenot, Licano, and Ortiz named in the Complaint. By this time, it was well known by both security and medical staff that Mr. Esquivel was trading for or buying lidocaine patches, consuming the liquid, and suffering dangerous seizures as a result.

**Defendants Knew About Frequent Lidocaine Use In Colorado Territorial Correctional Facility (CTCF) And The Deadly Risk It Posed**

All Defendants knew that unprescribed lidocaine use was prevalent throughout the facility. Lidocaine is a topical, local anesthetic administered through a patch. When prescribed and used correctly, the patch is placed on the skin and numbs pain in the area around the patch. However, Defendants knew that incarcerated people in CTCF were commonly misusing lidocaine patches by boiling them and drinking the liquid.

Drinking boiled lidocaine patch liquid is an obviously very dangerous use of the substance, as all Defendants knew. Ingesting (or injecting) lidocaine can cause a host of medical and neurological problems, including seizures, psychosis, dizziness, confusion, cardiac arrest, respiratory depression, and other cardiovascular and neurological symptoms which can cause serious injury or be fatal. Lidocaine also lowers a person's seizure threshold, meaning it will cause seizures to occur particularly in persons suffering from a seizure disorder, like Mr. Esquivel.

Defendants also knew that consumption of lidocaine in this manner does not provide the

significant and addictive high associated with other substances such as opiates or amphetamines. Euphoria associated with lidocaine consumption is rare. Due to the limited euphoric reactions related to lidocaine use, Defendants knew that Mr. Esquivel resorting to lidocaine use showed the severity of his mental illness and his need for immediate treatment, in addition to being extremely dangerous and deadly given his underlying history of seizures.

All Defendants knew lidocaine was a "dangerous drug" involving these risks, and classified it as such. Indeed, when Mr. Esquivel was suspected of using lidocaine, he was placed in isolation and punished for "dangerous drugs." Despite this, Defendants failed to take action to protect Mr. Esquivel from this dangerous substance or to address his underlying conditions, in deliberate indifference to the risks. All Defendants knew given their experience and profession, as well as common sense, that unless Mr. Esquivel received mental health treatment including substance abuse treatment, he would continue to self-medicate with lidocaine and other dangerous substances.

### Defendants Licano, Fontenot, and Ortiz Were Deliberately Indifferent In Failing to Protect from Lidocaine Despite Repeated Warnings

Defendants Captain Licano, Lieutenant Virgil Fontenot, and Commander April Ortiz served in supervisory positions during the events alleged in the Complaint, including Mr. Esquivel's seizure related to lidocaine on August 9, 2022. Due to their positions, Defendants Licano, Fontenot, and Ortiz learned about Mr. Esquivel's series of medical emergencies and hospitalizations over the course of 2022, including his August 9 seizure. These Defendants also knew about his misuse of lidocaine patches. Despite this knowledge and personal involvement in these events, Defendants Licano, Fontenot, and Ortiz failed to take action to ensure Mr. Esquivel received the help he desperately needed, or to ensure he did not have access to the dangerous

lidocaine jeopardizing his life.

Defendant Licano was shift commander on May 15 at the time of Mr. Esquivel's seizure, and personally interviewed Mr. Esquivel after he returned from the hospital, making him acutely aware of the dangers. Showing he knew substances were involved, Defendant Licano ordered a cell search and urinalysis. Rather than ensure Mr. Esquivel received a neurological or seizure evaluation, or otherwise received help, Defendants punished Mr. Esquivel by placing him in solitary confinement in restricted housing for 15 days related to the May 15 medical emergency.

Defendants Licano, Fontenot, and Ortiz also knew about Mr. Esquivel's June 5 and August seizures. After each of these events, Mr. Esquivel once again was placed in solitary confinement in restricted housing for 15 days as a punitive response and denied the care he needed. These Defendants also knew that placing Mr. Esquivel in isolation, with his evidence mental illness and untreated suffering, would exacerbate the risk he would continue to self-medicate with lidocaine.

Defendants Licano, Fontenot, and Ortiz knew lidocaine patches were found in Mr. Esquivel's cell, that he tested positive for lidocaine, and that Mr. Esquivel was known to misuse lidocaine. Defendants Licano, Fontenot, and Ortiz knew that Mr. Esquivel obviously suffered from a seizure disorder related to his multiple life-threatening seizures, and they further knew it appeared his use of lidocaine was triggering the dangerous seizures.

Despite this, Defendants Licano, Fontenot, and Ortiz failed to fulfill their supervisory duty to ensure Mr. Esquivel was safely housed and treated while in their custody. After the August 9 seizure event related to lidocaine, these Defendants failed to ensure Mr. Esquivel received a seizure or neurological evaluation and failed to take any action to prevent him from

accessing lidocaine patches in the future.

In deliberate indifference to Mr. Esquivel's health and life, they aggravated the danger to Mr. Esquivel by first putting him in isolated restricted housing, which inflicts substantial suffering on a person with mental illness like Mr. Esquivel, and then placed him in general population areas in the same prison, around the same people and access to lidocaine he had previously—knowing full well that his repeated seizures meant the same thing or worse would inevitably occur.

These Defendants, as supervising officers, knew they had available options to ensure Mr. Esquivel's safety, but failed to take action in deliberate indifference. For instance, these Defendants could have ordered Mr. Esquivel remain in medical observation where he would not have access to lidocaine; ordered Mr. Esquivel be transferred to a unit where no incarcerated person was prescribed lidocaine patches, thus cutting off any possible supply; ordered a facility search for contraband lidocaine patches; transferred Mr. Esquivel to a protective custody unit where he'd be under close supervision and would not have access to lidocaine; or, taken any other reasonable action to cut off Mr. Esquivel's access to this dangerous, deadly substance. Rather than take any such action, Defendants Licano, Fontenot, and Ortiz allowed Mr. Esquivel to go right back to the same environment where he'd nearly died multiple times, and where they knew he'd suffer the same outcome or worse.

**Defendants Williams And Caley Ignored A Letter From Attorney Explicitly Alerting Them To Mr. Esquivel's Condition And His Urgent Need For Treatment**

Due to concern for his health and safety arising from these seizures, Mr. Esquivel's family helped him contact attorneys in 2022 to try to get him the help he desperately needed. On July 11, 2022, attorneys Helen Oh and Tyrone Glover (Attorneys) wrote a letter to CDOC

officials Director Dean Williams and Warden Ed Caley. In the letter, these Attorneys sounded

the alarm which was already obvious: Mr. Esquivel was suffering multiple life-threatening

seizures and needed immediate neurological and other treatment. Attorneys notified Defendants

Williams and Caley that Mr. Esquivel suffered a seizure on May 15, 2022, as well as a seizure-

like incident around June 5, 2022, both of which caused him serious injury. They notified them

that Mr. Esquivel wanted medical treatment for his seizures. They notified them that Mr.

Esquivel continued to experience confusion, tremors, intense nausea, drooping facial muscles,

and other alarming neurological symptoms. Attorneys then provided caselaw and argument

reiterating to Defendants Williams and Caley their duty to ensure Mr. Esquivel received care for

these alarming seizures and other neurological symptoms that had hospitalized him on multiple

occasions. Attorneys specifically noted Mr. Esquivel needed an evaluation by a neurologist.

Defendants Williams and Caley received the Attorney letter by email and it was reviewed

and preserved. Defendants Williams and Caley failed to take appropriate and necessary action in

response to this Attorney letter in the coming weeks, including throughout August and up to and

including September 5, in deliberate indifference to Mr. Esquivel's health and life.

Defendants Williams and Caley further knew that lidocaine abuse was occurring in

CTCF, and that people including Mr. Esquivel were trading property or purchasing lidocaine

patches, which they would then consume by boiling the patch and drinking the liquid. They

knew this use of the substance was dangerous and potentially fatal.

**Defendant Case Manager Mary Ann Garcia Was Deliberately Indifferent**

Defendant Mary Ann Garcia was Mr. Esquivel's case manager in CTCF for multiple

periods of time and knew him well, including being his case manager July-September of 2022 up

14

to the time of his death. As a case manager, Defendant Garcia had a duty to guide Mr. Esquivel through his period of incarceration by providing him with tools and resources to ensure his safety, health, and further his rehabilitation. These responsibilities include linking Mr. Esquivel to services, *i.e.,* mental health and other care, ensuring his protection in the facility by monitoring safety concerns, making housing recommendations, and working as a liaison between medical, mental health, and security staff.

As case manager, Defendant Garcia reviewed Mr. Esquivel's prison file and was familiar with his history of seizures, his history of self-medicating with substances including lidocaine, the family tragedy of his sister Luisa's death in late 2021, and the other circumstances of his confinement as alleged in the Complaint. Defendant Garcia also knew, as did all Defendants, about the use of lidocaine patches in CTCF and that such use posed a serious danger to the health and life of people like Mr. Esquivel.

Defendant Garcia learned that on August 13, 2022, Mr. Esquivel reported to staff that he was consuming lidocaine to cope with Luisa's death, or self-medicating to cope with the symptoms of depression or other mental condition impacting him. Despite this explicit cry for help, Defendant took no action to eliminate or even reduce Mr. Esquivel's access to lidocaine, or to ensure he received treatment for the grief and suffering he was enduring.

Mr. Esquivel specifically asked Defendant Garcia to be seen by Mental Health on August 23, 2022. Defendant Garcia knew about Mr. Esquivel's August 9 medical emergency and life-threatening seizure, she knew he was using lidocaine to self-medicate, and she knew he needed immediate help. Despite the crisis, Defendant Garcia failed to ensure Mr. Esquivel received a prompt mental health assessment on August 23 or thereafter. He would be dead just a few weeks

later on September 5, never having received the help he needed.

This delay and denial of access to mental health care by Defendant Garcia was in deliberate indifference to the serious and immediate risk Mr. Esquivel faced if his mental illness remain untreated.

Defendant Garcia also failed to ensure Mr. Esquivel was referred to a neurologist or seizure specialist. Because of Defendant Garcia's deliberate indifference to the risks of another seizure, Mr. Esquivel never received any diagnosis or treatment for his seizures.

Defendant Garcia further failed to ensure Mr. Esquivel was placed in housing that would provide adequate monitoring, or that would eliminate or even reduce his access to lidocaine.

Defendant Garcia knew that, in response to Mr. Esquivel's hospitalizations in May, June, and August, CDOC punished him with solitary confinement, which she knew only exacerbated his symptoms and made it more likely he would continue to self-medicate. In reckless disregard to these known risks, Defendant Garcia allowed for Mr. Esquivel to remain housed in an environment that had already been proven life-threatening.

Defendant Garcia's failure to ensure prompt mental health and medical care, and a safe housing environment, was a direct cause of his death.

### Defendants Failed To Protect And Monitor Mr. Esquivel On September 5 When They Knew He Was At High Risk Of Poisoning From Lidocaine

By August and September, it was well known to Defendants and staff in the facility that lidocaine and seizures posed a serious danger to Mr. Esquivel's life, and that he needed careful monitoring for safety. On September 5, 2022, the predictable tragedy happened: Mr. Esquivel died from a seizure related to lidocaine toxicity. This death was not only preventable by the

Defendants who failed to act prior to that date, it was preventable had Defendants Hines, Vrell, and Robinson performed their duties to keep Mr. Esquivel safe.

Defendants were also aware of Mr. Esquivel's need for vigilant supervision given his recent seizure hospitalizations in May, June, and on August 9. On September 5, Defendants were responsible for conducting safety rounds in the unit where Mr. Esquivel was housed. That means visually ensuring Mr. Esquivel and other people in their custody were safe, breathing, and alive. Post Orders implemented by CDOC require officers conduct rounds by requiring incarcerated persons stand, to ensure they are breathing and conscious and not in distress.

At approximately 11:00 AM, Defendants Vrell and Robinson conducted a safety round of Mr. Esquivel's unit but failed to ensure he stood and/or was breathing and safe. They failed to ensure he was in a standing position, as required by Post Orders. On information and belief, during a round at 12:00 PM, they once again failed to ensure Mr. Esquivel stood, in violation of Post Orders. Defendants Vrell and Robinson then failed to conduct any safety rounds whatsoever of Mr. Esquivel's unit between 12:00 PM and the end of their shift at 2:00 PM, also in violation of Post Orders.

At approximately 2:14 PM, as part of the next shift, Defendant Hines conducted a safety round but failed to ensure Mr. Esquivel was breathing and safe, and failed to require he stand, in violation of Post Orders. At approximately, 3:09 PM, Defendant Hines again conducted an inadequate safety round, failing to ensure Mr. Esquivel was breathing and safe or that he stand, in violation of Post Orders.

During a round at 4:10 PM, Defendant Hines noticed that both Mr. Esquivel and his cellmate had not responded to Defendant Officer Hines' instruction, as they remained in their

bunks. Defendant Officer Hines instructed Mr. Esquivel's cellmate, who eventually responded, to pull what seemed to be a rug from Mr. Esquivel's face. Defendant Officer Hines noticed discoloration and that Mr. Esquivel was unresponsive. She entered the cell and pulled Mr. Esquivel from the top bunk. A medical emergency was declared.

Policy required that safety round be completed every 30 minutes. In reckless disregard of this obligation, Defendants conducted these rounds every hour or not at all. Had Defendants adequately checked Mr. Esquivel, they would have seen his alarmin positioning, which would have triggered obvious concern for his safety. The fact that Defendants never even noticed the rug covering Mr. Esquivel's face shows they failed to visually check Mr. Esquivel, in violation of Post Orders. Defendants Hines, Vrell and Robinson knew these Post Orders exist to ensure the safety of people in their custody like Mr. Esquivel. Their failure to ensure his safety during this time period was in deliberate indifference to the known and obvious risks of harm, particularly given his well-known recent history of life-threatening seizures and lidocaine toxicity events, and his well-known use of lidocaine and other dangerous substances.

Had these Defendants performed adequate safety checks, Mr. Esquivel's seizure would have been detected, and medical intervention would have prevented his death and saved his life. Seizures can be fatal as Defendants knew, but they are also treatable including through use of anti-seizure medications and rescue medications like benzodiazepines. Had Defendants acted diligently instead of with indifference, Mr. Esquivel would not have died on September 5, 2022.

### Defendants Action And Inaction Caused Mr. Esquivel To Die From Fatal Lidocaine Toxicity

On September 5, 2022, around 4:00 PM, Mr. Esquivel was found unresponsive in his cell. Mr. Esquivel had no pulse and was not breathing. His skin in his hands and face was

darkened with patches of pooled blood. Mr. Esquivel had blood coming from his mouth and his left eye was open and prominently bulging from his face. His hands were locked and fisted and his arms were bent and rigid. His condition was consistent with having suffered a seizure.

Due to the actions and inaction of the Defendants and deliberate indifference as alleged in the Complaint, on September 5, 2022, Mr. Esquivel died from a seizure and lidocaine toxicity.

**Defendants:**

Inmate Victor Esquivel died in CDOC custody on September 25, 2022. The Estate alleges that Esquivel's death was caused by the combined effects of lidocaine toxicity, a "seizure condition," and a fatal seizure triggered by lidocaine abuse. None of the Defendants are alleged to have prescribed or given lidocaine to Esquivel. He obtained and consumed it illicitly, unbeknownst to the Defendants. In essence, he is alleged to have poisoned himself and triggered a lethal seizure.

Therefore, there are several reasons that Defendants should not be held legally responsible for Esquivel's death. First, the officer and supervisor defendants had no constitutional obligation to protect Esquivel from exposure to harmful drugs. Second, even if such an obligation existed, each Defendant is not alleged to have personally participated in the alleged violations; further, the facts alleged do not make it plausible that each defendant acted unreasonably and with a culpable mental state. Third, even assuming constitutional violations occurred, the alleged violations were not so clearly established as to abrogate qualified immunity protections. Thus, Defendants contend that all claims asserted should be dismissed.

### 4. UNDISPUTED FACTS

1. Plaintiff Victor Esquivel died on or about September 5, 2022.

2. The coroner's report indicated that lidocaine toxicity was a cause of death.

3. Plaintiff died while incarcerated at Colorado Territorial Correctional Facility (CTCF).

4. Plaintiff was incarcerated within CDOC facilities from July 17, 2013, to September 5, 2022.

5. Defendant Dean Williams was the Executive Director of CDOC from January 8, 2019, to December 2, 2022.

6. At the time of Esquivel's death Ed Caley was the warden of CTCF.

7. Defendants were employed by CDOC at the time of Esquivel's death.

## 5. COMPUTATION OF DAMAGES

**<u>Plaintiff:</u>**

Plaintiff seeks all appropriate relief at law and equity; declaratory relief and other appropriate equitable relief; economic losses on all claims as allowed by law; compensatory and consequential damages, including damages for emotional distress, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial; punitive damages on all claims allowed by law and in an amount to be determined at trial; attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law; pre- and post-judgment interest at the appropriate lawful rate; and any further relief that this court deems just and proper, and any other relief as allowed by law.

In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

Plaintiff's damages are not of the type that can be tallied here. Plaintiff has claims for

emotional distress damages. These are not quantifiable other than by a jury. Undersigned counsel will provide Defendant in this matter with whatever quantifiable evidence is obtained to show measurement of damages, but civil rights violations like this are not given to easy description of losses and instead require that the jury announce their value.

A more precise computation of Plaintiff's damages, to the extent the damages are subject to such computation, will be provided during the normal course of discovery, and will be determined by a jury in its sound discretion following a presentation of the evidence at trial in this matter.

**Defendants:**

Defendants contend that Plaintiff is not entitled to monetary damages or declaratory or injunctive relief based on the claims asserted.

**Court: Within 45 days of the Scheduling Conference, on or before January 31, 2025, Plaintiff shall provide Defendants with a more precise computation of economic damages.**

### 6. REPORT OF PRECONFERENCE DISCOVERY AND MEETING UNDER FED. R. CIV. P. 26(f)

a.  The Fed. R. Civ. P. 26(f) meeting was conducted via remote conference between counsel on **November 19, 2024**.

b.  Participants in the meeting were as follows: David Maxted, Stephanie Frisinger, Amy Adams, and Joshua Urquhart.

c.  The parties made their Rule 26(a)(1) disclosures on or before **December 10, 2024**.

d.  The parties propose a one-week extension of time to the timing of required disclosures under Fed. R. Civ. P. 26(a)(1) due to the Thanksgiving Holiday.

e.   The parties have not agreed to conduct informal discovery.

f.   The parties agree to take all reasonable steps to reduce costs to discovery, including using a unified exhibit numbering system.

g.   The parties anticipate that their claims or defenses will involve the discovery of some electronically stored information. To the extent that discovery or disclosures involves information or records in electronic form, the Parties will take steps to preserve that information.  The Parties agree that, to the extent feasible, the Parties will exchange information (whether in paper or electronic form) in PDF format, and the parties will protect the privacy of confidential materials exchanged in discovery.

h.   The parties have discussed the possibilities for a prompt settlement or resolution of the case by alternate dispute resolution, but at this juncture settlement appears premature. The parties will continue to work together in good faith to determine whether the matter can be resolved.  To the extent there is a settlement meeting, the parties will report the result of any such meeting, and any similar future meeting, to the magistrate judge within 14 days of the meeting.

**Court: A brief discussion was held regarding potential settlement. The Parties may file a Motion for a Settlement Conference with the Court if appropriate.**

### 7. CONSENT

The parties have not consented to the exercise of jurisdiction of a magistrate judge.

### 8. DISCOVERY LIMITATIONS

a.   Modifications which any party proposes to the presumptive numbers of depositions or interrogatories contained in the Federal Rules:

Plaintiff proposes that, in addition to the named Parties, experts, and 30(b)(6) depositions, each side will be limited to five fact depositions. Plaintiff notes that there are 11 Defendants named in the lawsuit. The Defendants propose that each side will be limited to ten fact depositions, inclusive of parties and 30(b)(6) designees, but exclusive of experts.

**Court: Each side will be limited to thirteen (13) fact depositions, excluding 30(b)(6) designees and experts. Each side may conduct up to ten (10) depositions for a duration of seven (7) hours. The remaining three (3) depositions are limited to a duration of four (4) hours.**

Per Fed.R.Civ.P. 33(a), a party may serve on any other party no more than 25 written interrogatories. Plaintiff proposes no changes to this rule, as this would allow Plaintiff to serve 25 interrogatories on each Defendant in the case. The Defendants in this case were not acting in unison and are not nominally separate parties; instead, each Defendant had a distinct involvement or role in the events at issue. Separate sets of interrogatories, which conform to Fed.R.Civ.P. 33(a), are therefore justified and appropriate. Defendants strongly object to having discovery limits applicable on a party-by-party basis; because there are 11 named Defendants, it would essentially permit Plaintiff to serve Defendants with up to 275 interrogatories. Defendants propose that each side be allowed twenty-five interrogatories, subject to supplementation if need is demonstrated; however, Defendants are willing to discuss a higher limit provided that it applies on a per-side (and not per-party) basis.

**Court: Each side may serve on any other party up to 140 interrogatories total. Five (5) of the 140 interrogatories shall apply to all Defendants. Should additional interrogatories be necessary, the parties are instructed to confer, and, if an agreement cannot be reached,**

**may email Chambers according to the discovery dispute process detailed at 8(f).**

b.  Limitations which any party proposes on the length of depositions: The Parties do not propose any modifications to the limitations on the length of depositions. A deposition is limited to one day of seven hours as provided in Fed.R.Civ.P. 30(d)(2).

c.  Limitations which any party proposes on the number of requests for production and/or requests for admission: Plaintiff asserts that it should be allowed 44 Requests for Production and 33 Requests for Admission to Defendants collectively, and that Defendants should be allowed 25 Requests for Production and 25 Requests for Admission to Plaintiff. This would allow Plaintiffs approximately 4 Requests for Production and 3 Request for Admission to each Defendant, which appears more than fair given Defendants ability for 25 Requests for Production and 25 Requestions for Admission to Plaintiff. The Defendants assert that each side collectively should be permitted a total of 25 Requests for Production and 25 Requests for Admission. CDOC will be in possession of most of the documents sought, so there is little need to propound multiple requests to each defendant individually. To the extent that Plaintiff seeks discovery in excess of these limits, as a matter of fairness, the same amount should be allowed for each side.

**Court: Plaintiff may serve forty (40) Requests for Production and thirty-five (35) Requests for Admission. Defendant may serve twenty-five (25) Requests for Production and twenty-five (25) Requests for Admission.**

d.  Other Planning or Discovery Orders: No opposed discovery motions are to be filed with the Court until the parties comply with D.C.COLO.LCivR. 7.1(a). No party or witness shall bring or wear a gun to his or her deposition.

e.  Deadline for service of Interrogatories Requests for Production of Documents and/or Admissions:  Plaintiff proposes submission of the written interrogatories at any time after the date of entry of the Scheduling Order. Defendants note that they have filed a motion to dismiss as to all claims and have asserted qualified immunity as a defense. Accordingly, they plan to file a motion to stay discovery as soon as possible.  In any case, the last written discovery requests shall not be served upon any adverse party any later than forty-five (45) days prior to discovery cut off.

f.  **Rather than file a motion about a discovery dispute, the Parties first shall confer on the matter. If the Parties are unable to resolve the dispute on their own, then the Party seeking relief shall request a Discovery Conference with the Court by sending an email, copied to all Parties, to *o'hara_chambers@cod.uscourts.gov*. The Court will issue an order to schedule the Discovery Conference and to provide the Parties with instructions on how to proceed. The Court will determine at the conference whether to grant leave to file a motion. (As permitted by D.C.COLO.MJ § VI, a motion may be filed <u>without</u> the prerequisite discovery conference for discovery that concerns a third party.)**

**The Court requires that all conferral attempts be meaningful. A meaningful conferral is one done personally, such as face-to-face, in a video conference, or over the telephone. *See* D.C.COLO.MJ, § V(1). *See also*, *Bautista v. MVT Services, LLC*, 2017 WL 2082925, \*4 (D. Colo. Mar. 20, 2017). A meaningful conferral also is one that occurs in a reasonable timeframe before any relevant deadline.**

25

## 9. CASE PLAN AND SCHEDULE

a. Deadline for Joinder of Parties and Amendment of Pleadings: **April 30, 2025.**[1]

b. Discovery Cut-off: **October 31, 2025**

c. **Dispositive Motion Deadline: No later than ten (10) days after the close of discovery, a Party seeking to file a motion for summary judgment must email Judge Sweeney's Chambers (Sweeney_Chambers@cod.uscourts.gov), copying opposing counsel, to inform the Court of their intent to file such motion. The Parties shall comply with Judge Sweeney's** <u>**Standing Order Regarding Federal Rule of Civil Procedure 56 Motions.**</u>

d. Expert Witness Disclosure**:**

1.      (a) Plaintiff anticipates she may retain experts in the following areas: economics (regarding Plaintiff's damages); medical expert; toxicologist; corrections expert; and any expert necessary for rebuttal and/or impeachment purposes.  Plaintiff may call experts in other areas as well.

(b) Defendants anticipate calling experts in the following fields: economics expert (regarding plaintiff's damages); medical; mental health; corrections; and any expert necessary for rebuttal and/or impeachment purposes. Defendants may call experts in other areas as well. The Parties agree to limit the number of retained affirmative experts to three per side.

---

[1] As indicated in the Complaint, Plaintiff entered an agreement tolling the statute of limitations with two additional defendants, Jane Gilden and her employer Amergis Healthcare Staffing Inc. ("Amergis") d/b/a Maxim Healthcare Staffing Inc. This tolled the statute of limitations for these parties to discuss possible settlement. Should a settlement not be reached, Plaintiff has reserved the right to amend to add these defendants and additional claims against them to this lawsuit.

2.    The parties shall designate all affirmative experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **August 29, 2025.**

3.    The parties shall designate all rebuttal experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **October 10, 2025.**

**e. Identification of Persons to Be Deposed:**

| Name of Deponent | Date of Deposition | Time of Deposition | Expected Length of Deposition |
|---|---|---|---|
| Marisol Montalvan | TBD | TBD | 7 hours or less |
| Dean Williams | TBD | TBD | 7 hours or less |
| Ed Caley | TBD | TBD | 7 hours or less |
| David Licano | TBD | TBD | 7 hours or less |
| Virgil Fontenot | TBD | TBD | 7 hours or less |
| April Ortiz | TBD | TBD | 7 hours or less |
| Mary Ann Garcia | TBD | TBD | 7 hours or less |
| Nathan Bennion | TBD | TBD | 7 hours or less |
| Christopher Buchanan | TBD | TBD | 7 hours or less |
| Amoy Hines | TBD | TBD | 7 hours or less |
| Andrew Vrell | TBD | TBD | 7 hours or less |
| Brady Robinson | TBD | TBD | 7 hours or less |
| Daniel Kell | TBD | TBD | 7 hours or less |
| CDOC 30(b)(6) witnesses | TBD | TBD | 7 hours or less per witness |
| Other individuals disclosed pursuant to Fed.R.Civ.P. 26 or otherwise noticed by the parties | TBD | TBD | 7 hours or less per witness |
| Other witnesses to be identified during the course of discovery | TBD | TBD | 7 hours or less per witness |

## 10. DATES FOR FURTHER CONFERENCES

a.  **Status conferences will be held in this case on March 18, 2025, at 10:00 a.m. before United States Magistrate Judge Timothy P. O'Hara in Courtroom C-402 on the fourth floor of Byron G. Rogers United States Courthouse, 1929 Stout Street, Denver, Colorado.**

b.  **Within twenty-four hours after the Scheduling Conference, Parties shall jointly contact Judge Sweeney's Chambers by email (Sweeney_Chambers@cod.uscourts.gov) to get a Final Pretrial Conference date. The Parties shall refer to § III(A) of Judge Sweeney's <u>Standing Order Regarding Pretrial and Trial Procedures (Civil Cases)</u> for the procedure for submitting their proposed Final Pretrial Order.**

## 11. OTHER SCHEDULING MATTERS

a.  Identify those discovery or scheduling issues, if any, on which counsel after a good faith effort, were unable to reach an agreement: the number of depositions and the number of interrogatories (see 8.a.); number of Requests for Production and Request for Admission (see 8.c.).

b.  The parties anticipate that the jury trial will take seven (7) to ten (10) days.

c.  Identify pretrial proceedings, if any, that the parties believe may be more efficiently or economically conducted in the District Court's facilities at 212 N. Wahsatch Street, Colorado Springs, Colorado 80903-3476; Wayne Aspinall U.S. Courthouse/Federal Building, 402 Rood Avenue, Grand Junction, Colorado 81501-2520; or the U.S.

Courthouse/Federal Building, 103 Sheppard Drive, Durango, Colorado 81303-3439: None.

## 12. NOTICE TO COUNSEL AND PRO SE PARTIES

The parties filing motions for extension of time or continuances must comply with D.C.COLO.LCivR 6.1(c) by serving the motion contemporaneously upon the moving attorney's client.

Counsel will be expected to be familiar and to comply with the Pretrial and Trial Procedures or Practice Standards established by the judicial officer presiding over the trial of this case.

With respect to discovery disputes, parties must comply with D.C.COLO.LCivR 7.1(a) and the Magistrate Judge discovery dispute procedures.

Counsel and unrepresented parties are reminded that any change of contact information must be reported and filed with the Court pursuant to the applicable local rule.

## 13. AMENDMENTS TO SCHEDULING ORDER

The scheduling order may be altered or amended only upon a showing of good cause.

DATED at Denver, Colorado, this 18th day of December, 2024.

BY THE COURT:

_____
Timothy P. O'Hara
United States Magistrate Judge